C. Alex Naegele (State Bar No. 255887)
C. ALEX NAEGELE,
A PROFESSIONAL LAW CORPORATION
95 South Market Street, Suite 300
San Jose, CA, 95113
Telephone: (408) 995-3224
Facsimile: (408) 890-4645
Email: alex@canlawcorp.com

Attorney for Non-Debtor Interested Parties
DOORMAN PROPERTY MANAGEMENT, INC. and
NICHOLAS KRAEMER AND BARRETT RAFTERY,
A CALIFORNIA GENERAL PARTNERSHIP

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>DOORMAN PROPERTY MAINTENANCE, INC.<br><br>Debtor. | Case No. 15-30912 DM<br><br>Chapter 7<br><br>**DECLARATION OF NICHOLAS KRAEMER IN OPPOSITION TO TRUSTEE'S MOTION FOR ORDER SUBSTANTIVELY CONSOLIDATING ESTATES**<br><br>Date: April 8, 2016<br>Time: 10:00 a.m.<br>Place: 450 Golden Gate Avenue,<br>Courtroom 17,<br>San Francisco, CA, 94102<br>Judge: Hon. Dennis Montali |

I, Nicholas Kramer, hereby declare as follows:

1. I am a shareholder of Doorman Property Management, Inc., the non-debtor entity which the trustee seeks to consolidate with the debtor (the "Debtor") in the above-captioned case, as well as a partner in Nicholas Kraemer and Barrett Raftery, A California General Partnership (the "Partnership"). I have personal knowledge of the facts set forth in this declaration, and if called to testify, would and could testify competently thereto. As to those matters stated on information and belief, I believe them to be true. I submit this declaration in support of Doorman Property Management, Inc. and the Partnership's opposition to the chapter 7 trustee's motion to consolidate.

2. I submit this declaration to clarify certain points in the trustee and trustee's counsel's declarations that confuse the facts at hand, and to address the factors in *In re Bonham*, 229 F.3d. 750 (9th Cir. 2000) as they apply to this case.

3. I am the original founder of the business entities that are the subject of the trustee's motion. I started the businesses as a sole proprietor in 2010.

4. In 2011, I brought on a business partner, Barrett Raftery, and we formed a general partnership (the "Partnership") by signing a partnership agreement. A true and correct copy of this agreement is attached hereto as Exhibit A.

5. The Partnership operated under my and Barrett's brokers licenses granted by the Department of Real Estate ("DRE"), and its initial goal was to be a property management business, not a construction company.

6. Eventually, clients of the Partnership requested handyman and maintenance work for the properties that the Partnership managed. California law prohibits non-licensed contractors to perform handyman work exceeding $500 without a contactors license.

7. Accordingly, seeing another business opportunity, I inherited and acquired from my father a contractors license, which I put to use in the Partnership. This allowed the Partnership to perform both 1) property management and 2) handyman and maintenance work exceeding $500.

8. The Partnership never intended to do large remodels and general construction. However, as the business grew, we saw more and more demand for larger and larger construction and remodel projects.

9. Over the course of two years, it became increasingly clear that the initial business model of property management with light handyman work had ballooned into two separate businesses – one for property management, and the other for large remodels and general construction work.

10. It no longer made sense to keep both large businesses within the scope of one general partnership, and a separate business needed to be created to separate licensing, payroll, and accounting.

11. Accordingly, Doorman Property Maintenance, Inc. was formed as a California Corporation on May 13, 2013. As per its name, Doorman Property Maintenance was to take over the large remodels and general construction work.

12. For a while, the Partnership continued to operate the property management business as an unincorporated entity.

13. When it became very clear that the property management business also needed to be incorporated, Doorman Property Management, Inc. was formed as a California Corporation on October 27, 2014.

14. With the forming of Doorman Property Management, Inc. and the existence of Doorman Property Maintenance, Inc. already set up, the transition of the two lines of business into two separate incorporated entities was complete.

15. Doorman Property Management, Inc. never worked on construction work, and only did property *management* work, and Doorman Property Maintenance, Inc. only worked on *construction* work, and did not do any property management work.

16. The owners and employees of each company were different as well. The equity sharing split among all three entities is as follows:

a) Partnership:

    i) Nicholas Kramer: 50% - Barrett Raftery: 50%

b) Doorman Property Maintenance, Inc.:

    i) Nicholas Kramer 47.5% - Barrett Raftery: 47.5% - Pedro Sutter: 5%

c) Doorman Property Management, Inc:

    i) Nicholas Kramer 48.75% - Barrett Raftery: 48.75% - Yessica Zhu: 2.5%

17. Pedro Sutter was employed by Doorman Property Maintenance, Inc. as a contractors to do construction work.

18. Yessica Zhu, whose declaration is filed concurrently herewith, was and is a bookkeeper who was granted an equity stake in Doorman Property Management, Inc., and now runs much of the day to day operations of Doorman Property Management, Inc. as morefully described in her declaration.

19. Doorman Property Maintenance, Inc. and Doorman Property Management, Inc. also had distinct and separate assets to delineate their separate business functions. Each entity owns each of the following:

<u>Partnership owns:</u>

a. 40' Forklift

b. Domain name doormansf.com

c. Two Cushman Scooters

d. A Tuffpowerwasher & Trailer

e. One Computer

f. 5 Year Lease of Premises at 231 6th Street, San Francisco, CA

Doorman Property Maintenance, Inc. owns:

   a. Miscellaneous hardware, paint, milk crates
   b. Miscellaneous tools
   c. A few PC Computers and electronic cables
   d. A couple VoIP telephones
   e. Bank Account Operating Funds (turned over to trustee)
   f. Accounts Receivable (turned over to trustee)
   g. A dumpster

Doorman Property Management Inc. owns:

   a. A mac laptop
   b. One active listing agreement
   c. An operating account
   d. A savings account
   e. Employment contracts with employees

20. The assets of each entity are clearly identifiable and not co-mingled. Moreover, each asset is clearly for the business function for which that particular entity was assigned – either property management or property construction.

21. The customers of each entity knew there was a difference between the entities because we used separate logos for billing and marketing purposes. For example, in Exhibit B, a copy of which is attached hereto, one can clearly see the "Doorman Property Maintenance" logo on a bill to a customer for construction work.

22. By contrast, Doorman Property Management, Inc. used a different logo. Attached hereto as Exhibit C is a management report prepared for Doorman Property Management, Inc. with the logo of Doorman Property Management, Inc. – which is clearly different from the logo of Doorman Property Maintenance.

23. In addition, each entity had a separate set of books and no consolidated set of books was ever prepared. When only the Partnership existed, obviously there were only one set of books for the Partnership. When the Partnership and Doorman Property Maintenance, Inc. existed at the same time, two separate sets of books were kept.

24. For example, in tax year 2014, when both the Partnership and Doorman Property Maintenance Inc. existed for the entire tax year, two separate sets of books were prepared. Attached as Exhibit D is the Partnership's profit and loss statement for tax year 2014. Attached as Exhibit E is Doorman Property Maintenance, Inc.'s profit and loss for tax year 2014.

25. Non-debtor Doorman Property Management, Inc. also has its own separate set of books. The first full year of operations for Doorman Property Management, Inc. was 2015. Doorman Property Management, Inc.'s 2015 profit and loss statement is attached hereto as Exhibit F.

26. Moreover, there are no cross-guarantees of any kind between the three entities to creditors. In other words, no creditor who lent to Doorman Property Management, Inc. sought a cross guarantee from Doorman Property Maintenance, Inc. or the Partnership or vice versa.

27 Instead, each lender sought a personal guarantee of the primary owners and shareholders, rather than cross-guarantees of the other companies assets. Here is list of credit and services extended from 2010 onwards for the three entities and who is the guarantor on each loan:

    a. Sole Proprietorship – Extension of Credit to Nicholas Kramer, Sole Proprietor by Chase Bank – Sole Guarantor: Nicholas Kramer

    b. Partnership – Extension of credit to buy materials from Jensen (a hardware wholesaler) – personally guaranteed by Nicholas Kramer and Barrett Raftery.

    c. Partnership – Extension of credit to buy materials from Golden State Lumber – sole guarantor: Nicholas Kraemer.

    d. Doorman Property Maintenance, Inc. – Line of Credit extended by Chase bank to Doorman Property Maintenance, Inc. – sole guarantor: Nicholas Kramer.

29. None of the lenders looked to other entities for collateral. All of the guarantees were made by the primary individual owners, not the other legal entities.

30. Moreover, the lenders listed above did not extend money, property, or services based upon the assets or cash flow of the other entities, but rather did so based upon the creditworthiness of myself and Barrett as individuals. Hence, for example, no lender (say Chase) requested the income, cash flow statements, or balance sheet, of another one of the three entities when extending credit to just one of the entities.

31. Instead, the lender looked to the income, assets and credit of that one entity's owners, or myself and Barrett.

32. This is true for the Partnership as well, as the other entities did not exist at the time the creditors extended money, property, or services to the Partnership.

33. Regarding the location of the office space, assets, and transfer of assets, the Partnership leased a space at 231 6th Street, San Francisco, CA, on March 27, 2013 for a five year period for $3,400 per month. The space is a commercial warehouse space of 3,400 square feet.

34. Barrett and I are on very good terms with the landlord, Sasha Besse, and the $100 per square foot price in the heart of downtown San Francisco is an excellent rate, especially since it does not increase over the five year period and and rents have been steadily increasing in San Francisco from 2013 onwards.

35. Because we saw no reason to rent another space with the creation of Doorman Property Maintenance, Inc. and Doorman Property Management, Inc., and changing the name on the five year lease might "upset the apple cart," the Partnership to make payments of $3,400 on the lease to landlord Sashe Besse, while allocating specific portions of the 3,400 square foot space to Doorman Property Maintenance, Inc. and Doorman Property Management, Inc.

36. To have rented two separate spaces, one for Doorman Property Maintenance, Inc. and a separate one for Doorman Property Management, Inc. and pay effectively 150% the rent would have been financial suicide for both legal entities.

37. Accordingly, we allocated a space within 231 6th Street, San Francisco, CA for Doorman Property Maintenance, Inc., and a separate space within 231 6th Street, San Francisco, CA for Doorman Property Management, Inc.

38. Doorman Property Maintenance, Inc., which used construction equipment and needed a place for cars, vehicles, and construction crew to enter and exit used the back entrance of 488 Tehama, San Francisco, CA to perform all of the construction work. However, 488 Tehama, San Francisco, CA was not recognized by the U.S. Postal Service for delivery of mail. Therefore, for mailing purposes, we listed Doorman Property Maintenance, Inc.'s mailing address as 231 6th Street, San Francisco, CA, the same as Doorman Property Management, Inc.

39. Doorman Property Maintenance, Inc. (i.e. the Debtor) still has property of the estate sitting at 231 6th Street, San Francisco, CA which is waiting to be taken by the trustee or auctioned off. We have made multiple demands for the trustee to take action to liquidate and/or move this business property of the Debtor, but to date no action has been taken.

40. There has been no-comingling of assets between the entities. Each entity has its own space within 231 6th Street, San Francisco, CA, for the simple reason that the Partnership has sub-leased part of the space to other tenants wholly unrelated to the Doorman group of entities – and each entity clearly has its own space marked, and all of the assets of each entity are held in their own space.

41. The other subtenants in 231 6th Street, San Francisco, CA, that the Partnership has subleased the space to include a construction company and a delivery retail outfit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March 2016, at Tokyo, Japan.

    /s/ Nicholas Kraemer
    Nicholas Kraemer